## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**BOBBIE RANDLE**                                                                    **PLAINTIFF**

**v.**                             **Case No. 4:18-cv-00452-KGB**

**JAMES SMITH,** *et al.*                                                      **DEFENDANTS**

## <u>OPINION AND ORDER</u>

Before the Court is the motion for summary judgment of defendants Chief of Police James Smith, Detective Wesley Smith, and Officer Cynthia Gamble in their individual and official capacities, and the City of Helena-West Helena, Arkansas ("City") (collectively "defendants") (Dkt. No. 34). Plaintiff Bobbie Randle has responded to the motion for summary judgment (Dkt. No. 46). Defendants have replied to the response (Dkt. No. 49). For the reasons that follow, the Court grants defendants' motion for summary judgment; dismisses without prejudice Ms. Randle's claims against the City and Chief Smith, Detective Smith, and Officer Gamble in their official capacities; dismisses with prejudice Ms. Randle's claims against Chief Smith, Detective Smith, and Officer Gamble in their individual capacities brought pursuant to 42 U.S.C. § 1983 claiming violations of her First and Fourth Amendment rights and the Arkansas Civil Rights Act of 1993, Arkansas Code Annotated §§ 16-123-101 *et seq.* ("ACRA") claiming violations of her First and Fourth Amendment rights to extent those rights under Arkansas law equate to those rights under federal law; and declines to exercise jurisdiction over Ms. Randle's remaining state law claims (Dkt. No. 34).

I.       **Factual Background**

A.       **Ms. Randle's July 11, 2017, Arrest**

On July 5, 2017, Detective Smith was contacted by a nurse with Baptist Hospital in Stuttgart, Arkansas, who advised him that a white male by the name of Alex Bennett claimed that he had been assaulted in Helena-West Helena (Dkt. No. 47, ¶ 1).  Officer Charles Byrd turned the matter over to the General Investigation Bureau, which began an investigation (*Id*.).  On July 7, 2017, Mr. Bennett came to the Helena-West Helena Police Department ("HWHPD") and removed his clothing in order to display the injuries to his person (*Id*., ¶ 2).  The HWHPD took photographs of Mr. Bennett, and the photographs were made part of the investigative file (*Id*.).  Mr. Bennett provided a recorded statement to Detective Smith in which he recounted how he had been injured (*Id*., ¶ 3).

Mr. Bennett told Detective Smith that he had received a call on July 4, 2017, from Tevin Randle, whom he referred to as "T.K."   On the call, T.K. asked Mr. Bennett about his sister Kayla Willhite's car (*Id*., ¶ 4).  T.K. had been friends with Mr. Bennett in high school (Dkt. No. 46-2, at 21-22).  Mr. Bennett stated that he went to T.K.'s house located at 207 Harvey Street in Helena-West Helena (Dkt. No. 47, ¶ 5).  Upon arriving, T.K. told Mr. Bennett to call about his sister's car to see if he could get it back because it had been towed (*Id*.).

During the course of the investigation, Detective Smith was made aware that Ms. Randle, T.K.'s aunt, had called the police to report as stolen the silver/gray Mercury Sable, which was registered to Ms. Willhite (*Id*., ¶ 6).  Ms. Randle told the dispatcher that she just bought the car from "somebody" and that she did not know the license plate number; the dispatcher reported that it seemed as if Ms. Randle "didn't want to give me any info." (Dkt. No. 34-1, at 80).  Ms. Randle testified later at her deposition that she bought the Mercury Sable from someone named Jason and

that she had the car for two or three days before it was stolen out of the yard (Dkt. Nos. 47, ¶ 7; 49-1, at 4).  She testified that she had paid $800.00 for the Mercury Sable but still owed $200.00 for the car, so she did not have the title to the car (Doc Nos. 47, ¶ 7; 46, at 2, ¶ 6).  Ms. Randle stated that she called the police to report the Mercury Sable stolen (*Id.*).

The stolen car was involved in a high speed chase with the police (Dkt. No. 47, ¶ 8).  The police never found out who stole the car (*Id.*, ¶ 9).  When the car was located, it was towed away and impounded (*Id.*).  The police put a hold on the car, and neither T.K. nor Ms. Randle could get it out of impound (*Id.*).  When processing the car, officers found $11.00 in cash and Ms. Randle's prescription pill bottle (*Id.*, ¶ 10).  While officers were processing the Mercury Sable, an individual arrived and said that it was his daughter's car (Dkt. No. 49-2, at 6).  The individual stated his daughter was Kayla Willhite (*Id.*).

The Mercury Sable is the car that T.K. asked Mr. Bennett to retrieve according to Mr. Bennett's statement (Dkt. No. 47, ¶ 10).  Mr. Bennett stated that he called his parents about the car; when he got off the phone, T.K. punched Mr. Bennett in the face, and T.K.'s brothers, Daron Williams and Derrick Williams, and an unidentified black male attacked him (*Id.*, ¶ 11).  Mr. Bennett told Detective Smith that he was taken into the bathroom; that the four individuals stripped him naked, put a rag in this mouth, and taped it in place; that they bound his hands and legs; and that they placed him in the bathtub (*Id.*, ¶ 12).  The individuals then cut him repeatedly, burned him with hot knives, and poured bleach over his body (*Id.*).  According to medical records that were obtained as a part of the investigation, Mr. Bennett's left ear had to be reattached with stitches (*Id.*, ¶ 13).

Mr. Bennett told Detective Smith that this treatment of him went on for about an hour when T.K. ordered them to stop.  T.K. pointed a shotgun at Mr. Bennett and asked if he was trying to

escape (*Id.*, ¶ 14).  He then had Mr. Bennett get dressed and allowed him to come back into the living room where he was met by Ms. Randle (*Id.*).  Mr. Bennett told Detective Smith that Ms. Randle asked him how they were going to get the towed car back, who had beaten him, and if it was T.K. that beat him (*Id.*, ¶ 15).  Mr. Bennett lied and told Ms. Randle that T.K. was not the person who beat him because he was afraid of what might happen (*Id.*).  T.K. also confirmed this in his deposition testimony (*Id.*).

Officers prepared affidavits and warrants (Dkt. No. 46-3, at 15).  Circuit Judge Christopher Morledge held a probable cause hearing and found probable cause for Ms. Randle's arrest for violations of Arkansas Code Annotated §§ 5-13-208 (coercion, a class A Misdemeanor); 5-54-122 (filing a false report, a Class D Felony); and 5-2-403 (accomplices, a Class D Felony) (Dkt. No. 47, ¶ 16).

Ms. Randle admits that she reported the Mercury Sable stolen and that she had bought the car several days before (*Id.*, ¶ 16).  Judge Morledge issued arrest warrants on all three charges on July 11, 2017 (*Id.*, ¶ 17).  Ms. Randle contends that Judge Morledge issued the arrest warrants based on false information given to him (*Id.*, ¶ 17).

Detective Smith arrested Ms. Randle on July 11, 2017 (Dkt. No. 34-1, at 33).  Officer Gamble was present at the time Ms. Randle was arrested (Dkt. No. 34-1, at 36).  On the same day, Ms. Randle had her first judicial appearance before District Judge D.W. King, who found that there was probable cause for detaining Ms. Randle pending further proceedings (Dkt. No. 47, ¶ 18).  Ms. Randle states that Judge King's ruling was based on a false affidavit filed by Detective Smith (*Id.*, ¶ 19).

The prosecuting attorney for the First Judicial District decided that he would not pursue felony charges against Ms. Randle and authorized the HWHPD to discharge Ms. Randle from its

custody or exonerate the bail, "unless the matter is to be prosecuted in district court as a misdemeanor." (*Id.*, ¶ 19).  It was determined that Ms. Randle would not be prosecuted for a misdemeanor (*Id*).

### B.    Ms. Randle's Criticism Of The Defendants

The only time Ms. Randle appeared on television and criticized the HWHPD was on February 14, 2014, three years and five months before her arrest on July 11, 2017 (*Id.*, ¶ 25).  Ms. Randle states that, from the time that she appeared on television, law enforcement repeatedly commented on her "big mouth"; that she also made comments to other police officers about the hostile comments that Detective Smith made to her; and that she made "numerous remarks to law enforcement about being corrupt" (*Id.*, ¶ 25).  Ms. Randle admitted at her deposition that she did not complain to television stations about the police department in 2015, 2016, or at any time in 2017 leading up to her arrest at issue in this litigation (*Id.*, ¶ 27).

Ms. Randle has never publicly criticized the performance of Chief James Smith, who was not hired until April 24, 2017 (*Id.*, ¶ 20).  Ms. Randle has spoken privately with him, but she could not say that she ever criticized his performance as Chief of the HWHPD (*Id.*).  Ms. Randle testified that Chief Smith had never made any hostile comments toward her (*Id.*).

Ms. Randle asserts that she told other police officers about the hostile comments that Detective Smith made to her (*Id.*, ¶ 21).  In 2014, Detective Smith told Ms. Randle, "I wish you would stop running your damn mouth so much," and he told Ms. Randle that if she did not stop running her mouth she was "going to pay" by being "locked up" (Dkt. No. 46-1, at 8).  Officer Gamble told Ms. Randle in 2017 that she "got too much mouth" and told Ms. Randle that she needed "to calm down." (*Id.*).  Officer Gamble also told Ms. Randle, "[w]ait until we get over there to the judge.  We're going to see about you." (*Id.*).  Officer Gamble heard Ms. Randle make

remarks toward her senior officers when they were responding to a call over in her area like, "'Y'all low down.' 'Y'all not doing your job,' or 'Y'all crooked.'" (Dkt. No. 46-4, at 7-8).

Ms. Randle has never publicly criticized the performance of Officer Gamble as an HWHPD officer (Dkt. No. 47, ¶ 22). Ms. Randle states that Officer Gamble made negative comments about her and witnessed her engage in First Amendment activity toward other officers and Officer Gamble's superiors (*Id.*, ¶ 22).

Ms. Randle never complained to the Helena-West Helena City Counsel about the HWHPD (*Id.*, ¶ 23). Ms. Randle has never criticized the operations of the HWHPD to the Helena-West Helena local newspaper (*Id.*, ¶ 24). Ms. Randle has not spoken to a newspaper reporter about the police department (*Id.*). Ms. Randle never criticized the HWHPD to the *Arkansas Democrat Gazette* or any other newspaper (*Id.*).

Ms. Randle testified that the officers of the HWHPD have a habit of shooting into people's homes instead of getting a search warrant (*Id.*, ¶ 28). Ms. Randle stated that, in 2014, the arrest of one of her brothers was false (*Id.*, 29). Ms. Randle's brothers Charlie Randle and David Randle both pled guilty to offenses that occurred on February 13, 2014 (*Id.*, ¶ 30).

###    C.    Training

Ms. Randle states that she does not know about the training that officers of the HWHPD undergo (*Id.*, ¶ 31). Detective Smith completed the Basic Police Training Course provided by the Arkansas Law Enforcement Training Academy ("ALETA") to satisfy the requirements to become a police officer (*Id.*, ¶ 32). Detective Smith completed 480 hours of training on various subjects of police work, including the laws of arrest (*Id.*, ¶ 33). Defendant Gamble completed the Basic Police Training Course provided by ALETA to satisfy the requirements to become a police officer

(*Id.*, ¶ 34).  Defendant Gamble completed 471 hours of training on various subjects of police work, including the laws of arrest (*Id.*, ¶ 35).

### D.    Ms. Randle's Complaint

On July 9, 2018, Ms. Randle filed her complaint alleging both federal and state law claims (Dkt. No. 1).  Ms. Randle brings her federal claims under 42 U.S.C. § 1983 and her state law claims under the ACRA and Arkansas common law (Dkt. No. 1, ¶ 2).[1]  In the first count of her complaint, Ms. Randle claims that defendants violated her right to freedom of expression under the First Amendment to the United States Constitution and to remonstrate under the Arkansas Constitution.  She claims that her arrest was an attempt to chill her exercise of her First Amendment rights.  She asserts that the City of Helena-West Helena either had a policy or custom that would allow "these types of arrests to occur, or they failed to train the individual officers" leading to the deprivation of Ms. Randle's rights (Dkt. No. 1, ¶  17).

In count two of her complaint, Ms. Randle claims that defendants arrested her without probable cause in violation of both the federal and state constitutions (*Id.*, ¶ 21).  As part of count two, Ms. Randle also asserts claims of malicious prosecution, abuse of process, and false imprisonment, which she asserts renders her a victim of a felony under Arkansas Code Annotated § 16-118-103 (*Id.*, ¶¶ 22-23).  Ms. Randle alleges that, "the City of Helena/West Helena approved this action through its Police Chief who failed to train the City of Helena/West Helena." (*Id.*, ¶ 24).

---

[1]  Ms. Randle's complaint alleges deprivation of her Constitutional rights under "42 USC 1993" (Dkt. No. 1, ¶ 2).  The Court, like the defendants, understands from the parties' filings that "1993" is a typographical error and that Ms. Randle intends to bring and is bringing her federal claims under 42 U.S.C. § 1983.

## II.     Legal Standard

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Group Inc. v. Exec. Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56).   Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'"   *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) (internal citations omitted).   "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."   *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).   A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.   *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).   "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.   *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).   The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.   The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.   *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998).   "The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

III.    **Discussion**

A.    **Official Capacity Claims**

In her response to the defendants' motion for summary judgment, Ms. Randle concedes

that she has no official capacity claims (Dkt. No. 46, ¶ 1).   Accordingly, the Court grants

defendants' motion for summary judgment and dismisses without prejudice all of Ms. Randle's

claims against the City of Helena-West Helena and her claims against Chief Smith, Detective

Smith, and Officer Gamble in their official capacities (Dkt. No. 34).

B.    **Individual Capacity Claims**

The only remaining federal claims Ms. Randle has are her § 1983 claims against Chief

Smith, Detective Smith, and Officer Gamble in their individual capacity asserting retaliatory arrest

pursuant to the First Amendment of the United States Constitution and a lack of probable cause to

arrest that she brings presumably pursuant to the Fourth Amendment of the United States

Constitution (Dkt. No. 46).[2]   While not addressed in her response to the motion for summary

judgment, Ms. Randle also has remaining individual capacity claims against Chief Smith,

Detective Smith, and Officer Gamble under the ACRA and claims against these defendants under

Arkansas common law.

---

[2] Ms. Randle does not state a specific constitutional provision that she alleges defendants violated in the second count of her complaint.  The Court, like the defendants, understands from the parties' filings that Ms. Randle is asserting a violation of the Fourth Amendment to the United States Constitution and perhaps a violation of Article 2, § 5 of the Arkansas Constitution (*See* Dkt. No. 35, at n. 4).

### 1.    Qualified Immunity Standard

Chief Smith, Detective Smith, and Officer Gamble allege that they are entitled to qualified immunity as to Ms. Randle's remaining claims against them in their individual capacities (Dkt. No. 35, 21-27).   Officers sued under § 1983 in their individual capacities can raise qualified immunity as a defense.   This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known."   *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014). Courts use a two-step inquiry to determine whether qualified immunity applies:   "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."   *Id.*   Courts may begin the analysis with either step.   *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015).   If a plaintiff cannot satisfy both prongs, then the defendant is entitled to qualified immunity.   *See Correia v. Jones*, 943 F.3d 845, 847 (8th Cir. 2019); *see also Davis v. Chase Cnty. Sch. Dist.* No. 536, No. 7:17-CV-5007, 2019 WL 1506690, at *4 (D. Neb. Apr. 5, 2019) ("To withstand a motion for summary judgment on qualified immunity grounds, a civil rights plaintiff must (1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated the plaintiff's clearly established right.").

Under the second prong of the qualified immunity analysis, "the plaintiff must demonstrate the law was clearly established."   *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."   *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks and citation omitted).   The relevant question is whether a reasonable

10

officer would have fair warning that his conduct was unlawful. *Jackson v. Stair*, 944 F.3d 704, 711 (8th Cir. 2019). A plaintiff must identify either "controlling authority" or "a robust consensus of cases of persuasive authority" that placed the constitutional question "beyond debate" at the time of the alleged violation. *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019). "A plaintiff need not always identify a case directly on point, but controlling authority or a robust consensus of cases of persuasive authority must put the statutory or constitutional question beyond debate." *Anderson ex rel. Anderson v. City of Minneapolis*, 934 F.3d 876, 881 (8th Cir. 2019) (quoting *Swearingen v. Judd*, 930 F.3d 983, 987 (8th Cir. 2019)). The state of the law should not be examined at a high level of generality. *Kelsay*, 933 F.3d at 979.

Ms. Randle claims that defendants arrested her on July 11, 2017, because she appeared on television and criticized the HWHPD in 2014. Ms. Randle asserts that her action in criticizing the police department was an exercise of her right of expression under the First Amendment. Ms. Randle further asserts that she was arrested without probable cause in violation of her Fourth Amendment rights. Ms. Randle asserts that the warrant for her arrest was "obtained under false or improper pretenses." (Dkt. No. 48, at 3). She asserts that the affidavit in support of the arrest warrant omitted material details regarding the charge of filing a false police report because the officers "never interviewed Kayla Willhite"; did not include any facts supporting the allegation that Ms. Randle coerced Mr. Bennett; and did not establish any facts sufficient to show that Ms. Randle was involved with the altercation between Mr. Bennett and T.K. (Dkt. No. 48, at 4-6). Chief Smith, Detective Smith, and Officer Gamble move for summary judgment based on qualified immunity on both claims (Dkt. No. 35, at 23).

### 2.     Chief Smith – Failure To Train

Chief Smith was not involved directly with the investigation or arrest of Ms. Randle.  Chief Smith contends that Ms. Randle has failed to prove that he violated either the First or Fourth Amendment with respect to her arrest.  When Ms. Randle was asked in written discovery to explain how Chief Smith had violated her constitutional rights, she stated in her responses that Chief Smith failed to "responsibly supervise" the officers and detectives under his command which resulted in her arrest without probable cause in violation of both the First and Fourth Amendments.

Ms. Randle did not assert a failure to supervise claim in her complaint and has not requested leave from the Court to amend her complaint to plead a failure to supervise claim (Dkt. No. 1).  Accordingly, Ms. Randle may not proceed at this stage of the proceedings on a failure to supervise claim against Chief Smith.  *See Sexton v. Hutton*, Case No. 3:06-cv-00163 WRW/JFF, 2008 WL 621077, at *3-4 (E.D. Ark. Mar. 4, 2008) (denying plaintiffs' motion to amend to bring a claim of failure to train after defendants had moved for summary judgment based on qualified immunity on plaintiffs' failure to supervise claim).  Even if Ms. Randle had pled a failure to supervise claim along with her failure to train claim against Chief Smith, however, Chief Smith is entitled to qualified immunity.

The doctrine of *respondeat superior* does not apply to § 1983 cases.  Instead, to state a claim for supervisory liability under § 1983, supervisors may be liable if either their direct action or their "failure to properly supervise and train the offending employee" caused the constitutional violation at issue.  *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (quotation omitted); *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989).  "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the

supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015). Deliberate indifference requires that a supervisor be aware of a substantial risk of unconstitutional harm. *Kahle v. Leonard*, 477 F.3d 544, 550-52 (8th Cir. 2007) (holding that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). Unconstitutional action that is "longstanding, pervasive, well-documented, or expressly noted by [ ] officials in the past" could be sufficient to allow a trier of fact to infer a different official's knowledge of the risk if "the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk." *Farmer v. Brennan*, 511 U.S. 825, 843 (1994).

A state actor may be liable for inadequate supervision or training of his employees "where (1) the . . . training practices [were] inadequate; (2) the [state actor] was deliberately indifferent to the rights of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice by [the state actor]'; and (3) an alleged deficiency in the . . . training procedures actually caused the plaintiff's injury." *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)); *see also Parrish v. Ball*, 594 F.3d 993, 997-98 (8th Cir. 2010). Even if certain employees or agents received training that was minimal at best, that finding alone will not satisfy a § 1983 claim for failure to train. *City of Canton*, 489 U.S. at 390-91. Instead, to satisfy the standard, a § 1983 plaintiff must demonstrate that in the light of the duties assigned to specific employees and agents the need "for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.*, at 390. A § 1983 plaintiff must demonstrate that the state actor "had notice that its procedures were

inadequate and likely to result in a violation of constitutional rights." *Andrews*, 98 F.3d at 1076 (quoting *Thelma D. v. Bd. of Educ.*, 934 F.2d 929, 934 (8th Cir. 1991)).

Ms. Randle has not alleged facts sufficient to support a claim of failure to supervise against Chief Smith. The only other arrest Ms. Randle points to, which she alleges was without probable cause, was the arrest of one of her brothers in 2014 (Dkt. No. 47, ¶ 29). Ms. Randle does not allege, however, that Chief Smith was aware of or involved with that arrest, and, in fact, Chief Smith did not become chief of HWHPD until April 24, 2017. Further both of Ms. Randle's brothers pled guilty to offenses that occurred on February 13, 2014 (*Id.*, ¶ 30).

Chief Smith had been chief of the HWHPD less than three months when Detective Smith arrested Ms. Randle on April 24, 2017. The undisputed facts establish that Detective Smith and Officer Gamble were trained police officers and that included training in the laws of arrest. Even if Ms. Randle can establish that Detective Smith or Officer Gamble violated her constitutional rights by arresting her, which as set forth below she cannot, Ms. Randle has not come forward with evidence that Chief Smith was aware of an obvious need for more or different training of Detective Smith or Officer Gamble in order to avoid the violation of a constitutional right or that Chief Smith was deliberately indifferent to such a need for additional training during the few months he served as chief prior to Ms. Randle's arrest. Consequently, Chief Smith is entitled to qualified immunity on Ms. Randle's failure to supervise and train claims.

### 3.   First And Fourth Amendment Claims

Ms. Randle contends that defendants violated her constitutional rights by arresting her in retaliation for exercising her First Amendment right to criticize the HWHPD, and she asserts that she was arrested without probable cause in violation of her Fourth Amendment right. At the core

of Ms. Randle's claim is her assertion that the affidavit in support of the warrant for her arrest was insufficient to support a finding of probable cause (Dkt. No. 48, at 2-6).

Defendants move for summary judgment based on qualified immunity on Ms. Randle's First and Fourth Amendment claims alleging that Ms. Randle cannot prove a constitutional violation because they either had probable cause to arrest her or because they are entitled to qualified immunity even if they arrested Ms. Randle under the mistaken belief that there was probable cause because the mistake was objectively reasonable (Dkt. No. 35, at 12-15, 24-26).

"The Fourth Amendment includes the right to be free from arrest without probable cause." *Lambert v. City of Dumas,* 187 F.3d 931, 935 (8th Cir. 1999). Similarly, the First Amendment includes the right to be free from retaliatory arrest, a necessary element of which is "[l]ack of probable cause." *See Galarnyk v. Fraser,* 687 F.3d 1070, 1076 (8th Cir. 2012) (alteration in original) (internal quotation marks omitted) (citing *McCabe v. Parker,* 608 F.3d 1068, 1075 (8th Cir. 2010)). Thus, if Ms. Randle can show that defendants arrested her without probable cause in violation of her Fourth and First Amendment rights, then she has established a violation of § 1983. Further, Ms. Randle's claims of "unlawful arrest" and "violation of freedom of speech" under the Arkansas Constitution pursuant to the ACRA also require the lack of probable cause. *See Smith v. Insley's Inc.,* 499 F.3d 875, 882 (8th Cir. 2007) ("The ACRA provides a cause of action for damages for 'the deprivation of any rights ... secured by the Arkansas Constitution' by any person acting under color of state law," and "further provides that, in construing this section, 'a court may look for guidance to state and federal decisions interpreting . . . 42 U.S.C. § 1983'" (quoting Ark. Code Ann. § 16–123–105)). For these reasons, Ms. Randle's federal claims brought under § 1983, and her state constitutional claims brought under the ACRA to extent those rights under Arkansas

law equate to those rights under federal law, turn on whether probable cause for her arrest existed. The Court will analyze the state and federal constitutional claims together.

"Probable cause exists if 'the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed . . . an offense.'" *Copeland v. Locke,* 613 F.3d 875, 879 (8th Cir. 2010) (alteration in original) (quoting *Flynn v. Brown,* 395 F.3d 842, 844 (8th Cir. 2005) (quoting *Hannah v. City of Overland,* 785 F.2d 1385, 1389 (8th Cir. 1986))). "[P]robable cause or arguable probable cause is fatal to a First Amendment retaliation claim." *Garcia v. City of New Hope*, 984 F.3d 655, 670 (8th Cir. 2021) (citing *Galarnyk v. Fraser*, 687 F.3d 1070, 1076 (8th Cir. 2012)). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable." *Bell v. Neukirch*, 979 F.3d 594, 607 (8th Cir. 2020) (quoting *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011)). An arresting officer is entitled to rely on a finding of probable cause by a judge "unless the affidavit was so lacking in *indicia* of probable cause as to render belief in the legitimacy of the warrant entirely unreasonable." *Turcios v. Carter*, Case No. 4:17cv00773 JLH, 2019 WL 11717130, at *3 (E.D. Ark. Jan. 22, 2019) (citing *United States v. Leon*, 468 U.S. 897 923 (1984)) (granting officers summary judgment on plaintiff's claim of arrest without probable cause because the plaintiff neither identified any misrepresentations in the affidavit in support of the warrant nor intentionally omitted material information). Whether the police had probable cause at the time of the arrest is a question of law for a court to decide. *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010).

In *Smithson v. Aldrich,* 235 F.3d 1058 (8th Cir. 2000), the Eighth Circuit found that probable cause could constitute the "other basis" to justify an arrest and preclude the inquiry into the police officer's arresting motive. In *Smithson,* the Eighth Circuit held that a law enforcement

officer is shielded by qualified immunity from a First Amendment retaliation claim if the officer had probable cause to arrest the plaintiff. *Smithson,* 235 F.3d at 1063. Further, if officers have probable cause, the arrests do not violate the Fourth Amendment and the officers are not liable. *Fisher*, 619 F.3d at 818 (quoting *Smithson*, 235 F.3d at 1063). It is not necessary for defendants to have had probable cause to arrest Ms. Randle for every crime with which she was charged. *See Campbell v. Sletten*, 198 F.3d 249 (8th Cir. 1999) (citing *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1080 (8th Cir. 1990) ("If an officer had probable cause to arrest an individual for committing a certain crime it is immaterial that the officer thought, even mistakenly, that he had probable cause to arrest the individual for a second crime.")).

Ms. Randle claims that probable cause did not exist because Detective Smith obtained the warrant "under false or improper pretenses." (Dkt. No. 48, at 3). Ms. Randle contends that Detective Smith's affidavit was insufficient to support a finding of probable cause for her arrest asserting that she did not file a false police report because she had purchased recently the Mercury Sable; that defendants "never interviewed Kayla Willhite"; that "Bobbie Randle did [not do] anything to instill fear in the mind and heart of Alex Bennet"; and that the affidavit does not show that "Ms. Randle was involved with the altercation between Alex Bennett and Tevin Randle." (*Id*., at 2-6). Ms. Randle claims that "[t]here were only facts stated sufficient to show a criminal violation for filing a false police report, but the judge was told only half the truth. There were no facts stated to support a warrant for the other charges." (*Id*., at 7-8).

To prevail on her challenge to Detective Smith's warrant affidavit based on intentional or reckless misrepresentations, Mr. Williams must show:

> (1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit, and (2) that the affidavit's remaining content is insufficient to establish probable cause. The same analysis applies to omissions of fact. The defendant must show: (1) that facts were omitted with the

17

> intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading, and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause.

*United States v. Gladney,* 48 F.3d 309, 313 (8th Cir. 1995) (quoting *United States v. Humphreys,* 982 F.2d 254, 258 n. 2 (8th Cir. 1992) (citing *United States v. Lueth,* 807 F.2d 719, 726 (8th Cir. 1986); *United States v. Reivich,* 793 F.2d 957, 960 (8th Cir. 1986))).   Regarding omissions, Ms. Randle "must show that the omitted material would be 'clearly critical' to the finding of possible cause." *Id.*, at 314 (quoting *United States v. Jacobs,* 986 F.2d 1231, 1235 (8th Cir. 1993) (quoting *Reivich,* 793 F.2d at 961)).

Based on the undisputed evidence in the record, the Court cannot conclude that a reasonable jury could find probable cause lacking with respect to the arrest warrants for Ms. Randle.  Detective Smith interviewed Mr. Bennett, the victim of the crime, upon whose veracity he was entitled to rely.  *See Gibson v. Cook*, 764 F.3d 810, 813 (8th Cir. 2014) (quoting *Fisher*, 619 F.3d at 816–17) ("[o]fficers are generally entitled to rely on the veracity of information supplied by the victim of a crime.").  Mr. Bennett explained that Ms. Randle was at the house where he was assaulted, but she did nothing to intervene or to seek help for him.  Mr. Bennett also explained to Detective Smith that Ms. Randle was interested in recovering his sister's car that had been towed and impounded.[3]  Ms. Randle's interest in the car was corroborated by information obtained from other officers who received a call from Ms. Randle reporting the car stolen from her yard and from the prescription bottle found in the car with Ms. Randle's name on it.  When reporting the car stolen, Ms. Randle represented that she had purchased the vehicle, but she refused to give any information about the vehicle to the dispatcher.  Officers verified that Ms. Willhite was

---

[3]   Ms. Randle's presence in the house and questioning of Mr. Bennett was later corroborated by T.K. at his deposition (Dkt. No. 34-1, at 43).

the registered owner of the Mercury Sable and knew that Ms. Willhite had also called about the vehicle and asked if the vehicle was in police custody.   Additionally, an individual, who approached officers processing the car, stated that the car belonged to his daughter and that his daughter's name was Kayla Willhite.

Detective Smith compiled information gathered during his investigation into an affidavit for an arrest warrant that was presented to Judge Morledge.  Judge Morledge held a probable cause hearing and issued arrest warrants for coercion under Arkansas Code Annotated § 5-13-208, filing a false report under Arkansas Code Annotated § 5-54-122, being an accomplice under Arkansas Code Annotated §§ 5-2-403 and 5-11-102, and liability for the conduct of another under Arkansas Code Annotated § 5-2-402 (Dkt. No. 34-1, at 51-59).   Later, Judge D.W. King held an initial appearance for Ms. Randle and found that there was probable cause for detaining Ms. Randle pending further proceedings (*Id*., at 60).

To the extent that Ms. Randle relies on the prosecutor's election not to pursue charges against her, the fact that a person is later found innocent is not material to the issue of whether there was probable cause at the time of the arrest.  *See Joseph v. Allen*, 712 F.3d 1222, 1225-26 (8th Cir. 2013); *Duhue v. City of Little Rock*, Case No. 4:14-cv-580 KGB, 2017 WL 1536231, *20 (E.D. Ark. 2017) (aff'd *Duhue v. City of Little Rock*, 902 F.3d 858 (8th Cir. 2018)) ("later conviction is not the standard for probable cause to arrest").

Ms. Randle asserts that Detective Smith provided an affidavit for the arrest warrant that contained false information, but Ms. Randle does not identify anything in the affidavit that was false.  She also asserts the affidavit contained half-truths, but Ms. Randle does not identify what the alleged half-truths were.  Ms. Randle admits that the Mercury Sable that she reported stolen was registered to Ms. Willhite.  Mr. Bennett's statement places Ms. Randle at the house where Mr.

19

Bennet was assaulted by Ms. Randle's nephew, T.K., and confirms that Ms. Randle was concerned with obtaining his sister's Mercury Sable.

Ms. Randle pins much of her argument about the deficiency of Detective Smith's affidavit on his failure to interview Ms. Willhite, but she has not come forward with evidence to establish that, had Detective Smith interviewed Ms. Willhite, Ms. Willhite would have corroborated Ms. Randle's story that the Mercury Sable belonged to Ms. Randle. *Gladney,* 48 F.3d at 314 (citations omitted) (stating that a party claiming an omission in an affidavit must show the omission was material and would be critical to a finding of probable cause). Importantly, Ms. Randle did not testify at her deposition that she purchased the Mercury Sable from its registered owner, Ms. Willhite, but instead Ms. Randle testified that she purchased the vehicle from someone named "Jason." Further, Ms. Randle admits that she did not have a title to the Mercury Sable at the time she reported it stolen, and it is undisputed that, when Ms. Randle called to report the car stolen, she did not give the dispatcher any detailed information about the car, such as the license plate number. The undisputed facts establish that Ms. Willhite was the registered owner of the Mercury Sable, that Ms. Willhite called HWHPD to ask if her car had been recovered, and that Ms. Randle did not attempt to claim the car from the HWHPD after it was recovered and impounded.

The Court concludes, based on the record before it, that there was probable cause or arguable probable cause to support Detective Smith's warranted arrest of Ms. Randle for at least one of the charged crimes. Ms. Randle has not come forward with evidence of false statements or facts omitted from Detective Smith's affidavit in support of the arrest warrants. For these reasons, the Court concludes that Ms. Randle has failed to establish that defendants violated Ms. Randle's First and Fourth Amendment rights, and the Court determines that defendants are entitled to qualified immunity on Ms. Randle's federal constitutional claims brought against them in their

individual capacity under § 1983 and state constitutional claims brought against them in their individual capacity under the ACRA to extent those rights under Arkansas law equate to those rights under federal law.  *See Kiser v. City of Huron*, 219 F.3d 814, 815 (8th Cir. 2000) (an arrest does not violate § 1983 if it is supported by probable cause); *Copperwood v. City of Kensett*, 2006 WL 3735977, *2 (E.D. Ark. 2006) (citing *Peterson v. City of Plymouth*, 60 F.3d 469, 473 (8th Cir. 1995) (holding that if an officer has probable cause to arrest a citizen, the officer does not violate the Fourth Amendment and the officer cannot be held liable)); *Smithson,* 235 F.3d at 1063 (holding that a law enforcement officer is shielded by qualified immunity from a First Amendment retaliation claim if the officer had probable cause to arrest the plaintiff).

### C.   State Law Claims

Ms. Randle asserts other state law claims of malicious prosecution, abuse of process, and false imprisonment (*Id.*, ¶¶ 22-23).  Ms. Randle does not address defendants' motion for summary judgment on these other state law claims (Dkt. Nos. 46, 48).  Because the Court grants summary judgment in favor of defendants on Ms. Randle's federal claims, the Court declines to exercise supplemental jurisdiction over Ms. Randle's remaining state law claims.

### IV.   Conclusion

For the reasons set forth above, the Court grants defendants' motion for summary judgment; dismisses without prejudice Ms. Randle's claims against the City and Chief Smith, Detective Smith, and Officer Gamble in their official capacities; dismisses with prejudice Ms. Randle's federal constitutional claims brought against Chief Smith, Detective Smith, and Officer Gamble in their individual capacities under § 1983 and state constitutional claims brought against them in their individual capacities under the ACRA to extent those rights under Arkansas law

equate to those rights under federal law (Dkt. No. 34); and declines to exercise jurisdiction over

Ms. Randle's remaining state law claims.

It is so ordered this 24th day of September, 2021.

Kristine G. Baker
United States District Judge